# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
## (Western Division)

| | | |
|---|---|---|
| Da-Heem Rodgers, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.** |
| | ) | **7:06-CV-01980-UWC** |
| | ) | **OPPOSED** |
| Averitt Express, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

PAGE

I.  RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS ......................... 2

II.  LEGAL ARGUMENT .................................................................. 7

    A.  Summary Judgment Should Not Be Granted to Plaintiffs With Respect to Stipulated Routes or Yard Truck Drivers .................. 8

    B.  Summary Judgment Should Not Be Granted to Plaintiffs With Respect to Ai3 Routes ................................................. 10

    C.  Summary Judgment Should Not Be Granted to Plaintiffs With Respect to ARD Routes ................................................ 12

    D.  Summary Judgment Must Be Denied to Plaintiffs With Respect to Brose Routes .......................................... 14

    E.  All Plaintiffs Are Subject To Being Called On to Drive In Interstate Commerce ...................................................... 14

III.  CONCLUSION ....................................................................... 21

CERTIFICATE OF SERVICE ............................................................ 22

i

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
(Western Division)**

| | | |
|---|---|---|
| Da-Heem Rodgers, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.** |
| | ) | **7:06-CV-01980-UWC** |
| | ) | **OPPOSED** |
| Averitt Express, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

The facts which plaintiffs rely upon to support their arguments that four categories of local drivers are not subject to the motor carrier exemption as a matter of law are either (1) disputed; and/or (2) not material to the issues presented for review. When the undisputed *material* facts (as Averitt has set forth in its own motion for summary judgment) are examined, it is clear that all of the local drivers are exempt as a matter of law. Accordingly, Plaintiffs' motion for partial summary judgment must be denied.

1

## I.    RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS[1].

1.    Admitted, except Averitt denies that all plaintiffs worked over 40 hours every workweek.  This issue is not material to the exempt status of the plaintiffs. (Answer to Third Amended Complaint at ¶¶ 30, 31, 35, 41, 44, 46, 48, 51, 52, 55, 56, and 61.)

2.    Admitted for summary judgment purposes only. The complete list of stipulated "non-interstate" suppliers is contained in Exhibit B hereto.  These stipulations are not material, however, since approximately half of the daily pickups by the local fleet are from Ai3, ARD, Decoma, Borgers, AGC, Brose, or suppliers outside Alabama, all of which are clearly "interstate" in nature (*See* Exhibit B), and because all drivers, including those assigned to exclusively "non-interstate" routes, were subject to being called on to pick up parts at any supplier, at any time.  *See* Section II (E) below.

3.    Admitted that the identified entities are local suppliers of MBUSI and pick up points for local drivers.  Local suppliers change over time and Averitt does not admit that this is a complete listing of all MBUSI local suppliers located within Alabama throughout the relevant period.

4.    Admitted for summary judgment purposes only.

---

[1] Averitt submitted its factual statement in narrative form in accordance with the instructions of the Court (*See* Exhibit A hereto).  However since Plaintiffs have utilized a numbered admit/deny format for their fact statement, to avoid confusion, Averitt responds in kind.

5.      Admitted for summary judgment purposes only.

6.      Admitted for summary judgment purposes only.  However, parts not subject to manufacturing or assembly at Brose are also delivered to MBUSI each day, via Averitt.  Osment Aff. ¶ 7.

7.      Admitted for summary judgment purposes only.

8.      Admitted for summary judgment purposes only.

9.      Admitted in part for summary judgment purposes only, however, some parts picked up by local drivers at ARD are not subject to either sequencing or assembly, and are not touched or processed in any way at ARD prior to being picked up by local drivers.  Supp. Rodman Declaration, ¶ ¶ 4-6; also, the "ARD Fuel Tanks" route ceased in June 2007.  Supp. Rodman Dec. at ¶ 9.

10.      Admitted in part for summary judgment purposes only, but denied with respect to the 8 percent of parts flowing through Ai3 to MBUSI ("cross dock parts") which are not warehoused at Ai3 or ever entered into inventory at Ai3, but are merely transferred from an inbound trailer to an outbound Averitt trailer at Ai3. Klein Dec. ¶  6; Klein Depo. at 43, 46.

11.      Admitted; however, these facts are not material in light of the undisputed fact that MBUSI is the intended final destination for all parts flowing through Ai3. Supp. Waggoner Dec. ¶ 5.

12.     Admitted that the majority of parts come to the MBUSI plants via Ai3.  Ai3 is the highest volume local pickup point and all local drivers, regardless of route assignment, are subject to being called on to pick up loads at Ai3. Supp. Smith Dec. ¶ 13; MSJ Exh. 3(A)(8,9,10).  However, there is evidence that parts in other categories than those listed herein come directly from suppliers to MBUSI without going through Ai3.  For instance, plaintiffs submitted an affidavit in support of their motion stating that fuel tanks go directly from ARD (or SPAN) to MBUSI.  *See* Melvin Moore Affidavit.

13.     Admitted, except denied with respect to cross dock parts.  Klein Dec. ¶ 6; Klein Depo. at 43, 46.  This fact is not material to the exemption.

14.     Admitted, except denied with respect to cross dock parts.  Klein Dec. ¶ 6; Klein Depo. at 43, 46.  This fact is not material to the exemption.

15.     Admitted.  This fact actually supports the exemption, since it shows there are no permanent route assignments, and that drivers may move between interstate and non-interstate routes during the course of their employment.  In addition, it is undisputed that drivers change route assignments temporarily or otherwise on a regular basis outside the bid cycle. Supp. Smith Dec. ¶ 13; Smith Depo. at 97-99, 225; MSJ Exh. 3.

16.     Admitted, except in instances where the bidding process does not go as planned.  Supp. Smith Dec. ¶ 13; Smith Depo. At 97-99; Hardy Depo. at 74; Kelly Depo. at 106-107; MSJ Exh. 3(B)(2,8).

17.     Admitted in part.  This admission applies to senior drivers only, and only to the extent the senior drivers bid on routes that are available when their number comes up, and to the extent the bidding process works as planned, which is not always the case. *Id*.  This fact is denied with respect to less senior drivers, who must take what is left and do not have the same "choice" as more senior drivers Supp. Smith Dec. ¶ 12; Fulgham Depo. at 98; Pruitt Depo. at 67.  This fact is also denied with respect to new drivers, who are arbitrarily assigned to routes with no choice in the matter. Supp. Smith Dec. at ¶ 11; Fulgham Depo. at 98.  Also, notwithstanding any stated "expectation" of a six-month assignment, there is no guarantee a driver will have a route for the entire six months or that they will not be called on to make pickups outside of their regular assignment.  *See e.g.*, Dallas Depo. at 80.  In fact, drivers expect they will be called to deviate from routine and understand this is part of their jobs.  Farmer Depo. at 92-93.

18.     Admitted. However, local drivers with regular route assignments are also used for this purpose. Hill Depo. at 99-100; Lake Depo. at 74-75.

19.     Denied. There is no support for this statement in the record with respect to MBUSI drivers. Plaintiffs misleadingly represent the testimony of Grant

Roberts, Site Manager for Averitt's Ogihara operation, as applying to all drivers in this case. It is undisputed that Ogihara is a separate operation utilizing a separate pool of drivers and that Mr. Roberts had no authority over MBUSI drivers.[2] Supp. Singer Dec. ¶ 6; Supp. Smith Dec. ¶ 19.` Michael Smith, the Site Manager for MBUSI, *never* testified that he used seniority as a basis for temporary changes in route assignments.  He testified that such selections are made for a variety of reasons, including who was available or happened to be around when a coverage issue arose, and there is no evidence in the record to place this testimony in dispute.  Supp. Smith Dec. ¶ 14.

20.    Admitted for purposes of summary judgment only, but immaterial, since there is no evidence that a driver ever actually refused an order to take an extra run.  Moreover, some of the plaintiffs admitted they could be ordered to deviate from their regular route assignment, and/or that they had never said no to a dispatch request.  Burns Depo. at 90; D. Harris Depo. at 54; Clark Depo. at 48; Washington Depo. at 60, 67-68; Pruitt Depo. at 43; Mahan Depo. at 37-38; Dallas Depo. at 84-85; Farmer Depo. at 94-99  It is undisputed that Averitt's handbook (received by all drivers) clearly states that refusal of a dispatch is insubordination punishable by termination. Supp. Singer Dec. ¶ 9, Exh. 2.

---

[2] Only a small percentage of the opt-in plaintiffs are Ogihara drivers.

5060732_1.DOC

## II.   LEGAL ARGUMENT.

Plaintiffs recognize that many of their number are exempt for at least portions of the relevant time period.  This recognition is obvious from the fact that they have not asked the Court to grant summary judgment on the motor carrier exemption issue with respect to all plaintiffs.  Rather, plaintiffs have only asked for summary judgment with respect to four "categories" of drivers.[3]  Of course, there are no such neat "categories" as plaintiffs describe.  It is undisputed that all local drivers, regardless of current route assignments, and including yard truck drivers, are the same job position, part of the same driver pool, subject to the same route assignment process, and are not permanently assigned to routes but can and do change assignments throughout their employment.  *See* Averitt's statement of facts set forth in its summary judgment brief. Thus, plaintiffs are not really asking the Court to issue rulings impacting certain discrete "categories" (or sub-classes) of drivers; rather, plaintiffs are asking the Court to issue general rulings which may then be used as part of an individualized, workweek-by-workweek analysis of the exempt status of each plaintiff based on his or her weekly assignments.  Averitt agrees such an analysis is necessary[4], *but only if* universal summary judgment in its favor is denied.

---

[3] Plaintiffs do not seek summary judgment on behalf of (1) drivers who picked up parts from out-of-state suppliers: (2) drivers who picked up at Alabama suppliers AGC, Borgers, and Decoma (all of which Averitt contends are interstate pickup points); or (3) Ogihara drivers.

[4] Indeed, this is the principal reason this case is not amenable to class treatment.

**A.**     **Summary Judgment Should Not Be Granted to Plaintiffs With Respect to Stipulated Routes or Yard Truck Drivers**

It is true that Averitt stipulated during the course of discovery that some of the local suppliers located in Alabama are not interstate pickup points, due to the fact that parts are manufactured or undergo complex assembly at the suppliers' facilities.  This list of stipulated suppliers is contained in the chart attached as Exhibit B hereto[5], and includes: **Benteler; Oris/Flex N Gate; Hoerbiger Hydraulics; Ogihara; PPG; Weidmann Plastics; ISE; Eberspacher; TWFittings; ZF; Gestamp; JCI; Delphi**. **Rehau** was not a supplier during the timeframe upon which this chart was based but is also stipulated to being a manufacturing supplier.  Averitt recognizes (at least for purposes of summary judgment) that its wholly intrastate transportation of parts from these suppliers to the MBUSI plants or Ai3 is not part of a "practical continuity of movement in interstate commerce." The same is true for drivers on yard truck assignments. However, summary judgment should not be granted with respect to workweeks in which drivers performed such assignments, for the following reasons:

---

[5]This chart is Exhibit 11 to the Supplemental Declaration of Michael Smith (Doc. 98, p. 656) but is attached again hereto for ease of reference.  Averitt's final stipulations were disclosed to plaintiffs along with Averitt's expert report on May 14, 2008.  Thus, it is unclear why Plaintiffs have presented the suppliers TW Fittings, Delphi, and Flex-n-Gate as being in dispute.  The only suppliers clearly in dispute are **Ai3, ARD, ARD Fuel Tanks/SPAN, and Brose** (all of which are addressed in Averitt's summary judgment motion).  **AGC, Borgers, and Decoma** (which Averitt also contends are interstate in nature and which are also addressed it is motion) are not mentioned in plaintiffs' brief.

5060732_1.DOC

First, plaintiffs fail to recognize the distinction between "suppliers" and "routes."  Suppliers are destinations where the local drivers pick up parts.  Except for Ai3, which is operated by Averitt, suppliers are operated by third party vendors of MBUSI.  Local drivers are not assigned to suppliers, rather, they are  assigned to routes, and the routes (as designated by MBUSI) sometimes involved daily pick ups from more than one supplier. Supp. Smith Dec. ¶ 9.  Sometimes interstate and non-interstate suppliers are combined in a single route.  This becomes clear upon examination of the route sheet submitted by Averitt with its summary judgment materials.  This document lists all routes available for bid in June 2006, and includes a detailed description of the daily pickups for each route, including several "combination routes" which included pickups at both interstate and non-interstate suppliers.[6]  Thus, plaintiffs have not correctly framed the issue; if the Court denies universal application of the exemption, and embarks upon the individualized assessment requested by the plaintiffs, the correct question is not whether a plaintiff was assigned to pick up from a "non-interstate" supplier during a particular week.  The correct question is whether plaintiffs picked up from an interstate supplier during a workweek; if the answer is yes (whether as part of his regularly assigned route, or as a temporary assignment), the driver must be deemed

---

[6] *See* Doc. 98, pp. 619-635, Exh. 6 to the Supp. Dec. of Michael Smith, listing the following "combination" routes: Plant 2, Rt. 26 (AGC, PPG); Rt. 32 (Brose, Delphi); Rt. 36 (ARD, Decoma, Gestamp); Rt. 39 (R&S (in Tennessee), Oris); Rt. 43 (Saargummi (also in Tennessee), Gestamp); Plant 1, Rt. 1 (JCI, Brose); Rt. 2 (TWFittings, Brose, AGC), Rt. 4 (ISE, Borgers).

exempt for a four-month period surrounding each such trip, regardless of what other "non-interstate" suppliers they visited during the week.

In any event, summary judgment should not be granted to any of the categories of drivers identified by plaintiffs, because *all* of the plaintiffs, including plaintiffs on non-interstate routes and plaintiffs on yard truck assignments, are subject to being called on to drive in interstate commerce.  The undisputed facts supporting this conclusion are established in Averitt's brief filed in support of its motion for summary judgment, and are addressed in summary form with respect to this motion in Section II (E) below.

**B.     Summary Judgment Should Not Be Granted to Plaintiffs With Respect to Ai3 Routes**

Plaintiff misstates (or speculates pertaining to) the relevant facts regarding Ai3.   The undisputed facts are correctly stated in Averitt's initial brief, and supported by the record, and nothing set forth in plaintiffs' briefing places Averitt's version of the facts regarding Ai3 in dispute.   Ai3 is not merely a terminal storage facility; goods do not come to rest there.   Rather, it is undisputed that most items picked up by local drivers from Ai3 remain at Ai3 for a very short duration whereas cross dock parts never reside at Ai3 and never become part of Ai3 inventory.   Klein Depo. at 39-40, 43, 46; Klein Dec. ¶ 6.   Nor is it true that "there is no evidence that any out-of-state shippers of products to Mercedes has a fixed and persisting intent for their products to travel beyond Ai3."   Rather, it is

undisputed that all parts coming into Ai3 (a vast majority of which originate outside Alabama) are intended for use in the manufacture of Mercedes' vehicles. All of these parts are ordered and shipped as part of a mandatory, multi-tiered process strictly controlled by MBUSI[7] and applicable to all MBUSI suppliers.[8]  All parts ordered through this process, including parts flowing through Ai3, are intended by both MBUSI and (necessarily) its "upstream" supplier/vendors, from the moment of manufacture, for delivery to the MBUSI plants.  Indeed, there is no other place the parts could go, as they are manufactured to MBUSI specifications. Supp. Waggoner Dec. ¶ 5.  All parts delivered to Ai3 are based on specific orders and the shipping arrangements for all parts inbound to Ai3 and outbound from Ai3 to the MBUSI plants are arranged in advance, by MBUSI, pursuant to long-standing contractual arrangements, including its contractual arrangement with Averitt.  Klein Dec. at ¶ 7; Singer Dec. ¶ 3; Smith Depo. at 35-37.  Parts are not materially altered at Ai3 (nor do plaintiffs even attempt to argue that any transformative process occurs at Ai3).  Items are picked up from Ai3 by a third

---

[7] Since MBUSI directs this process, it is the shipper.  However, even if the upstream supplier/manufacturers who originate the parts are deemed to be the "shippers" in this scenario, based on MBUSI's depiction of its tightly controlled, multi-tier parts ordering and shipping process, the result is the same.  It is evident that the intent of *all* parties is that the parts will ultimately be delivered to the MBUSI plants.

[8] MBUSI suppliers are required to pick up parts orders from a virtual mailbox controlled by MBUSI.  Waggoner Aff. ¶7. "All parts delivered to Ai3 are delivered as a result of a specific order for a specific number of parts having been placed with a MBUSI supplier…all parts delivered to Ai3 are intended to ultimately be delivered to one of [the two production plants in Vance]."  Supp. Waggoner Dec. ¶ 5.

party carrier (Averitt) and taken on public roads from Ai3 to the MBUSI plants.[9]

Thus, there could be no more perfect example of a "practical continuity of movement of goods in interstate commerce" than the runs from Ai3 to MBUSI. *Compare to Walling v. Mutual Wholesale Food & Supply Co.,* 141 F.2d 331 (8th Cir. 1944); FOH § 24d02(d).

### C.    Summary Judgment Should Not Be Granted to Plaintiffs With Respect to ARD Routes

ARD is a logistics center similar to Ai3.  Like Ai3, ARD deals exclusively with MBUSI, and, like Ai3, it does not "make" anything that goes into MBUSI vehicles, it merely stores, sequences, or performs very light assembly on items moving through its facilities.   "RAN" parts (parts identified by a receipt authorization notice number assigned by MBUSI) come into ARD daily from several states and Mexico and are shipped to Ai3 daily without being processed at all.  Regardless of the identity of the shipper (*i.e.,* whether MBUSI directs such shipments or whether such arrangements are made between ARD and the out-of-state suppliers) it cannot be disputed that all such items are predestined prior to their arrival at ARD for inclusion in Mercedes vehicles.  Like Ai3, ARD is merely one stage of a multi-phase delivery process, with parts passing through, materially unaltered, on the way to their final destination.  Thus, if the Court agrees that Ai3

---

[9] Plaintiffs emphasize the proximity of Ai3 to the MBUSI plants, without explaining the relevance of this fact. In fact, due to the placement of the exit gate at MBUSI, the trip between these two locations is 5-miles driving distance.  Supp. Smith Dec. Exh. 13.

is an interstate pick-up point, it should reach the same conclusion with respect to ARD, as there is no material basis for distinguishing between the two.

Fuel tanks ordered from MBUSI "upstream" supplier Kautex in Georgia also stop at ARD (now SPAN) before coming to the MBUSI plants. Supp. Smith ¶8. Plaintiffs are correct that fuel tanks are a separate run and that fuel tanks are not comingled with other items in the same truckloads. Supp. Rodman Dec. ¶9. Averitt also agrees that an assembly process occurs with respect to fuel tanks, which is more than what occurs with respect to the other runs which Averitt contends are interstate in nature. However, this assembly process is quite simple and not sufficient to materially alter the fuel tanks. *Musarra v. Digital Dish, Inc.,* 454 F.Supp. 2d 692 (S.D. Ohio 2006) (finding assembly of satellite dishes prior to delivery to customer) is more on point with the facts here than the case relied on by plaintiff.

"JVC" is not a separate supplier; rather, it is another category of ARD pickup. For a period of time ARD leased space from JVC where carpet from out of state was picked up by local drivers. These pickups were later transferred by MBUSI to a different supplier, Borgers. Supp. Smith Dec. ¶ 9; Cash Depo. at 91-94. Thus, the "JVC/ARD" runs are interstate in nature, for the same reasons applicable to the Borgers runs.

**D.      Summary Judgment Must Be Denied to Plaintiffs With Respect to Brose Routes**

For the reasons set forth in Averitt's initial brief, runs from Brose are interstate in nature. *See also* Osment Dec. ¶ 7.

**E.      All Plaintiffs Are Subject To Being Called On To Drive In Interstate Commerce**

Plaintiffs urge the Court to focus on the individual activities of each plaintiff to determine the applicability of the exemption.  However:

> The more difficult analysis arises in situations…in which the motor carrier seeks application of the exemption to an entire class of employees throughout their term of employment based on the limited interstate activities of a few.  The analysis is necessarily fact-specific and may be stated generally as follows:  "The Secretary [of Transportation]'s power wanes, and the employer's section 213(b) exemption consequently fades, only when the employer's interstate activities affecting the safety of interstate motor operations are de minimis."

*Kosin v. Ferdjo's Enterprises, Ltd.*, 1989 WL (N.D.Ill) *3 (citing *Peraro ex rel. Castro v. Chemlawn Services Corp.,* 592 F.Supp. 109, 114 (D.C.Conn.1988)).

Averitt's interstate activities with respect to the MBUSI operation, comprising approximately half of all daily pickups (*See* Exhibit B hereto), can hardly be deemed "de minimis," and in fact overwhelmingly exceeds the amount of interstate activity occurring in cases where the exemption has been applied.  In *Morris*, for instance, the Supreme Court held that despite the fact that *only 3.65% of the total*

*trips* made by the drivers of a general cartage business were out-of-state, the carrier was exempted from the overtime provision of the FLSA as to all drivers.

The Court in *Morris* found significance in the general nature of the carrier's business, holding that, if a "carrier is required by virtue of [its] status, to take…interstate business he must perform the required service in accordance with the requirements established by the [Interstate Commerce] Commission." 332 U.S. at 434, 68 S.Ct. at 137. In this case, Averitt is contractually obligated to timely deliver parts from MBUSI local suppliers, wherever such suppliers are located and regardless of the nature of supplier operations; those two factors, which obviously bear on the "interstate" nature of the runs, are outside the control of Averitt. Thus, interstate trips are potentially (and in reality) a "natural, integral and apparently inseparable part" of the service Averitt (and its drivers) provide to MBUSI. *Id.* at 433, 68 S.Ct. *See also* 29 C.F.R. 782.2(c)(1).

However, rather than addressing the undisputed facts regarding the nature of Averitt's operation (including Averitt's obligations to MBUSI and the flexibility Averitt's system afford drivers who *wish* to change routes) and the predicament in which these circumstances place Averitt with respect to federal regulation of its drivers, plaintiffs (despite presenting to the Court as a class) focus on their individual circumstances. They argue that the seniority-based bidding process and six-month assignment system establishes, as a matter of law, that drivers on non-

interstate assignments have only a remote (or less than remote) chance of being called on to drive in interstate commerce. This is simply not the case. First, contrary to plaintiffs' suggestion, there is no rule of law either requiring "random" or "indiscriminate" assignment of routes to support universal application of the exemption to a pool of drivers, nor precluding universal application of the exemption in cases where drivers are given regular route assignments. *See Chao v. First Class Coach Co., Inc.,* 214 F.Supp. 2d 1263, 1274 (M.D. Fla. 2001) (finding exemption applicable despite assigned routes). Rather the cases are fact-specific, and the underlying material inquiry is: Can the employer prove that the chances of any given driver to be called on are "more than remote"?[10]   *Garcia v. Pace Suburban Bus. Serv.*, 955 F.Supp. 75, 77 (N.D. Il. 1996).

Plaintiffs' own testimony carries Averitt's burden of proof on the this point. Plaintiffs admitted that they were called upon to deviate from their assigned routes during their employment for a variety of reasons, and most stated that this

---

[10] The cases relied upon by plaintiffs are easily distinguishable from the case at bar. *Goldberg v. Faber Industries, Inc.,* 291 F.2d 232 (7th Cir.1961), for instance, held that the defendant must pay overtime compensation to fifteen of its drivers who, unlike five other drivers (and unlike plaintiffs in this case), *never traveled interstate* on the defendant's behalf. The defendant failed to present evidence that any driver regularly assigned to an intrastate route ever drove an interstate route. *See also Kimball v. Goodyear Tire & Rubber Co.,* 504 F.Supp. 544, 547-48 (E.D.Tx.1980) (denying application of the motor carrier exemption because only a small fraction (.17%) of all the trips made by the plaintiff-drivers were interstate). In this case one hundred and twenty-four (124) of the approximately 130 opt-in plaintiffs picked up parts from an interstate supplier (including Ai3, ARD, Borgers, Decoma, AGC, Brose, and out-of-state suppliers) at some point during their employment. One hundred and one (101) Plaintiffs picked up from Ai3 alone, for a combined total of 43,896 trips just from Ai3. Def.'s MSJ Exh. 8b.

happened on multiple occasions.  For example, Christ Bolden stated that for about two to three months, he covered another route for a driver who was continually late for work on Fridays.  Bolden Depo. at 51-52.  John Burns stated that while he was regularly assigned to the PPG/AGC run, he had to fill in an extra run to Georgia because the driver who regularly had the run needed the day off.  Burns Depo. at 66-67.  Willie Travis was asked to do something other than his regular route a couple times a month or so, throughout his employment.  Travis Depo. at 109-110. Such testimony was nearly universal.  *See* Lake Depo. at 74, 76; Goff Depo. at 61-64; Hall Depo. at 66; Hardy Depo. at 52-53,56; Henry Depo. at 36-39; Hill Depo. at 99, 125; Rodgers Depo. at 51; Smoot Depo. at 45; Spigner Depo. at 46; Watkins Depo. at 32; Spears-Williams Depo. at 47; Turner Depo. at 50; Washington Depo. at 50, 80, 87-92; Moore Depo. at 324, 349, 365-66, 379-380; Bolden Depo. at 52; Mahan Depo. at 31, 36-37; Banks Depo. at .110, 115-166, 132-133; Blankenship Depo. at 69-71, 96-98; Farmer Depo. at 177-183; Fulgham Depo. 117-124; Blake Dec. ¶ 4; Epperson Dec. ¶ 4-5; Ferguson Dec. ¶ 8; Franklin Dec. ¶ 4 (called on twice in 5 weeks); Spurger Dec. ¶ 4; Cash Depo. at 72 (For six months "[w]hen the new plant first opened, we were just more or less swapped back and forth trying to fill runs . . .").

The degree of actual deviation from routine may have varied for each individual during different periods of time, and some of the drivers may never have

made interstate runs, but the cumulative testimony of plaintiffs inarguably demonstrates that, as a group, and individually, they were subject to be called upon to cover any route at any time, including interstate routes such as Ai3.  Burns Depo. at 73. ("I've been asked to cover Ai3.  Probably just about everything out there.  A lot of them.").

Moreover, based on what they saw happening around them each day, drivers understood they could be called on in a coverage situation.  Tony Farmer took on extra assignments other than his regular job duties "numbers of times because I look at it like this: Before I took the job – I mean, when I took the job with Averitt, like they say, we supposed to work together as a team . . . if we are doing it for a team . . . if we need some hot parts picked up somewhere, hey, if I ain't got nothing to do, I can do it . . ."  Farmer Depo. at 92. Mr. Farmer agreed that making extra runs as needed was part of his duty as a driver and he "really took that . . . into consideration" before taking the job.  Farmer Depo. at 93.  Leaundra Spencer explained that "They keep [us] pretty loaded down . . . Like between your route if you've got time to run another route, you know, they'll call you and, you know, they pretty much will ask you sometimes.  Sometime they'll tell you.  Because they know your schedule, so they know if you've got time between there and how far ever they want you to run that."  Spencer Depo. at 62-63.

Nor is the bidding process itself as rigid or susceptible to control by plaintiffs as they would have the Court believe. Certainly, new and low seniority drivers did not have "choice" in their assignments. Even for senior drivers, the bidding process was an imperfect process which did not guarantee their preferred route. For instance, when a senior driver's route was discontinued by MBUSI, he was allowed to choose a new route and bumped somebody off, in between bid cycles. Banks Depo. at 97. This set off a "chain reaction" where a driver who got bumped, bumped somebody else, who in turn bumped somebody else, and so on, resulting in "a lot of confusion" and "one big mess." Banks Depo. at 97-98. *See also* Hardy Depo. at 74; Kelly Depo. at 106-107. The record is replete with testimony from drivers voluntarily moving or being involuntarily reassigned or "bumped" from their chosen routes for a variety of reasons. *See* MSJ Exh. 3(B).

Nor does plaintiffs' representation of deviations from routine as being "voluntary" in nature preclude application of the exemption. First, again, there is no rule of law that in order to be deemed "subject to being called on" to drive in interstate commerce, drivers must be forced under threat of termination to take interstate assignments. The material issues are whether drivers were "called on" (they were), and whether deviations did occur (they did), creating more than a remote possibility that drivers would cover interstate routes during their employment. And again, in keeping with *Morris*, the pool as a whole is the proper

focus of the Court's inquiry—it may be that one driver might decline a request to pick up a load of parts at an interstate supplier, but *Averitt* could not turn down such a request from MBUSI, therefore *some* driver would have to go.   "[I]f Mercedes call for overtime, that means we don't have no other choice but to go." Hardy Depo. at 66.  Thus, it was appropriate for Averitt to treat the entire fleet as being subject to such requirements (and therefore, as being DOT-regulated).[11]

Moreover, plaintiffs greatly overstate their supposed ability to turn down dispatches.  While some of the plaintiffs said they sometimes turned down (and other times accepted) *requests* to deviate from routine, there is absolutely no evidence in the record that any of the plaintiffs ever turned down an *ordered* dispatch.[12]  Certain plaintiffs may have theorized that they had the ability to do so, but, in light of the unequivocal testimony of Averitt management that they had discretionary authority to order dispatches (Supp. Smith Dec. ¶ 14) such speculation does not create an issue of fact absent evidence that such insubordination actually occurred and was tolerated.

---

[11] DOT regulations state that the "a driver will remain under the jurisdiction of [DOT] for as long as the driver is in a position to be called upon to drive in interstate commerce as part of the driver's regular duties."  46 Fed. Reg. at 37903.

[12] Both Averitt managers and drivers acknowledged the difference between being asked and told. *Accord* L. Spencer Depo. at 65-66 (stating that he knew a driver could be told rather than asked to take a run, because both had happened to him) with Supp. Smith Dec. ¶14 (stating that he used discretion in deciding whether to ask or order a driver to take a run, and that in his experience a driver has never refused an *ordered* dispatch in a situation where coverage was needed).

5060732_1.DOC

## III.    Conclusion

For the foregoing reasons, plaintiffs' partial motion for summary judgment

must be denied; whereas Averitt's motion for summary judgment must be granted.

Respectfully submitted,


s/ Kara E. Shea
Kara E. Shea (BPR #18221)
Thomas Anthony Swafford (BPR #17578)
G. Brian Jackson (BPR #15497)
Tara L. Ferguson (BPR #24424)
MILLER & MARTIN PLLC
1200 One Nashville Place
150 Fourth Avenue, North
Nashville, Tennessee 37219
615/244-9270 / (615) 256-8197 (fax)
e-mail: kshea@millermartin.com
e-mail: tswafford@millermartin.com
e-mail: bjackson@millermartin.com
e-mail: tferguson@millermartin.com


Richard F. Ogle (ASB-8420-L73R)
OGLE, LILES & UPSHAW, LLP
600 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
P.O. Drawer 1865
Birmingham, Alabama 35201-1865
(205) 521-7000 / (205) 521-7007 (fax)
e-mail: roglefilings@ogleliles.com

5060732_1.DOC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Andrew C. Allen, Esquire
Richard R. Rouco, Esquire
Glen M. Connor, Esquire
Ashley L. McDavid, Esquire
Stephanie N. Johnson, Esquire
Whatley, Drake & Kallas, LLC
2001 Park Place North
Suite 1000
Birmingham, Alabama 35203
e-mail: ecf@whatleydrake.com

s/ Kara E. Shea
Kara E. Shea

5060732_1.DOC